IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LORA S. S.,[1]                      )
                                    )
        Plaintiff,                  )
                                    )
vs.                                 )   Case No. 18-cv-0961-DGW[2]
                                    )
COMMISSIONER OF SOCIAL              )
SECURITY,                           )
                                    )
        Defendant.                  )

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for disability benefits in October 2014, alleging disability as of October 1, 1995. After holding an evidentiary hearing, an ALJ denied the application on June 14, 2017. (Tr. 15-23). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect her privacy. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 20, 29.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.  The ALJ erred by failing to account for plaintiff's deficits in maintaining concentration, persistence, or pace in his RFC determination.

2.  The ALJ erred by failing to consider pertinent evidence pertaining to plaintiff's mental impairments.

3.  The ALJ erred by failing to consider pertinent evidence pertaining to plaintiff's lumbar impairment.

4.  The ALJ erred by finding plaintiff's limited activities support his finding that her statements about the intensity, persistence, and limiting effects of her symptoms are not entirely consistent with the medical evidence and other evidence.

5.  The ALJ erred in his evaluation of the opinion evidence.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work?  20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled.  A negative answer at any step, other than at step 3, precludes a finding of disability.  The plaintiff bears the burden of proof at steps 1–4.  Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Biestek v. Berryhill*, 2019 WL 1428885, at *3 (S. Ct. Apr. 1, 2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

The ALJ followed the five-step analytical framework described above. He determined that plaintiff had not worked at the level of substantial gainful activity since the date of the application. He found that plaintiff had severe impairments of degenerative disc disease of the lumbar spine; sedative, hypnotic, or anxiolytic intoxication with moderate or severe use disorder; post-traumatic stress disorder; and unspecified depressive disorder.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the light exertional level limited to occasional postural activities; only simple, routine, repetitive tasks involving only simple work-related decisions with few, if any, workplace changes requiring quota-based production as opposed to production requirements. Plaintiff had no past relevant work. Based on the testimony of a vocational expert, the ALJ concluded that plaintiff was not disabled

because she was able to do jobs which exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff was born in 1969 and was 47 years old on the date of the ALJ's decision. (Tr. 166). She had completed two years of college. She stopped working in June 2013. She had worked as a hotel housekeeper in May and June 2013, and as a secretary for two months in 2012. She did data entry for about a month in early January 2012. Before that, her last job was in 2002. (Tr. 171-172).

**2. Evidentiary Hearing**

Plaintiff was not represented by an attorney at the evidentiary hearing in March 2017. (Tr. 31).

Plaintiff testified that she lived with her twenty-six-year-old son. She had lost her medical insurance in January after she and her husband separated. (Tr. 37-38).

Plaintiff's primary care physician, Dr. Rawlings, prescribed Oxycontin and Hydrocodone for her back pain. She had no other treatment such as steroid

injections or physical therapy, since the spinal cord stimulator was removed in 2014. (Tr. 40-41). She was no longer taking Xanax. (Tr. 46). She could stand for about fifteen minutes. Standing caused her back to hurt. She could sit for fifteen to twenty minutes and then had to change position. Sitting caused pain in her leg and numbness in her feet. She could lift seven pounds. (Tr. 48). She had anxiety being around people. (Tr. 49).

On a normal day, plaintiff spent time sitting in a recliner to take the pressure off her back. She tried to do "little projects" such as going through her clothes. Her son did the main grocery shopping, but he would sometimes drive her to the little store in town to get a few items. Her son did most of the cooking, but she sometimes heated up food in the microwave. (Tr. 50-52).

Aside from her physical problems, her big problem was that she had trouble concentrating or remembering. She had been abused as a child, and was in a long abusive marriage, and one of her sons died at the age of twenty-four. It was hard for her to function mentally. (Tr. 53-54).

A vocational expert (VE) also testified. The ALJ asked him a hypothetical question which corresponded to the ultimate RFC findings. The VE testified that this person could do jobs such as hand packager, small products assembler, and visual inspector. The VE also identified sedentary jobs that she could do. If she were off-task for more than 15% of the workday or missed two or more days a month, she would be unemployable. (Tr. 56-58).

3. **Medical Records**

Plaintiff has had three lumbar spine surgeries. In October 2000, she underwent a laminectomy with disc space exploration at L4-5 and a laminectomy with discectomy at L5-S1. (Tr. 295). In February 2002, the laminectomy with discectomy at L5-S1was redone. (Tr. 299). In December 2002, a laminectomy with discectomy was done at L4-5.

An MRI of the lumbar spine done in January 2008 showed a small to moderate-sized disc protrusion at L3-L4 with displacement of the nerve root and moderate narrowing of the bilateral exiting neural foramina; a moderate-sized disc protrusion at L4-5 with significant associated annular tear and slight displacement of the nerve root; a moderate-sized central disc protrusion at L5-S1 with slight displacement of the nerve root; and moderate deformity of the thecal sac at the L5 level secondary to prominent ligamentum flavum hypertrophy and facet arthropathy. (Tr 561).

In May 2009, a nerve stimulator was surgically placed in plaintiff's lumbar area for a trial. The diagnosis was failed back surgery syndrome. The notes indicate she was "status post lumbar laminectomy with chronic residual lower back pain." (Tr. 290). She had more than 50% pain relief, so the stimulator was implanted permanently in June 2009. (Tr. 292).

Plaintiff saw Dr. Bistline, a pain management specialist in Florida, three times between August 2009 and February 2010. Plaintiff complained of low back pain consisting of a constant ache with intermittent sharp pain. She said her medications permitted increased activities of daily living and she was trying to start

a walking and exercise program. Dr. Bistline noted decreased range of motion of the lumbar spine, and mile to moderate spasm and tenderness to palpation of the lumbar paraspinal muscles. Muscle strength and reflexes were normal. Straight leg raising was positive, greater on the right. She was to continue taking MS-Contin (morphine) and Zanaflex. She was prescribed Oxycodone. Because of complaints of increased pain, Dr. Bistline ordered a CT scan. (570-575).

A CT scan done in June 2010 showed a posterior central disc herniation indenting the thecal sac at L3-4; a broad-based disc herniation at L4-5 with bilateral narrowing of the neural foramina and impingement on the L4 nerve roots; and a broad-based posterior disc herniation at L5-S1 with bilateral narrowing of the neural foramina and impingement on the L5 nerve roots. (Tr 576).

Plaintiff was treated for back pain at Optima Health and Diagnostics in Florida from July 2010 to April 2011. Examination showed tenderness and limited range of motion of the lumbar spine. She was prescribed Morphine and Oxycodone. (577-586).

The next treatment was in September 2012 when plaintiff began seeing Dr. Thomas Black as her primary care physician. His office was in Indiana. She had moved to Indiana from Florida about a year earlier. She had been seeing pain management for her back in Florida but had not seen anyone in Indiana because she had just gotten insurance. She also complained of anxiety and "family issues of abuse that are resurfacing" because her abuser lived in Indiana. Neurologic exam was normal. Dr. Black prescribed Mobic and Vicodin for back pain, and

Xanax for anxiety. He referred her to a counselor, Lucy Field. (Tr. 409-410).

Plaintiff was seen by Lucy Field, Ph.D. beginning in October 2012. Dr. Field saw her in conjunction with Dr. Black. Plaintiff complained of depression, anxiety, insomnia, and difficulty concentrating. There are no office notes or records of mental status exam findings, but there are four referrals to Dr. Black for prescriptions, including anti-depressives and Adderall for ADHD. The last referral form is dated in February 2013. (Tr. 478-483).

Plaintiff continued to see Dr. Black for back pain, anxiety, depression, and ADHD through January 2015. He prescribed a number of medications for her back pain, including Vicodin, Tramadol, Flexeril, and Gabapentin. Dr. Black advised her to not to use her pain medications when concentration on tasks was needed. He prescribed Adderall for ADHD. For depression, her prescriptions included Viibryd, Lexapro, Valium (Tr. 386-407). In June and July 2014, she said that Norco was working well for her back pain. She also said the spinal stimulator had worked only for the first couple of months. Dr. Black referred her to pain management. (Tr. 382-384).

Dr. Black's records do not contain notes recording range of motion, muscle strength, sensory examination, or palpation for tenderness.

In September 2014, Dr. Black noted that plaintiff had seen Dr. Haber and had been prescribed Percocet for back pain.

Dr. Haber is evidently a pain management specialist. His notes are not in the record. Dr. Haber referred her to Dr. Pradeep for removal of the spinal

stimulator. A nurse practitioner in Dr. Pradeep's office did a presurgical examination on September 29, 2014. She noted that plaintiff's memory, concentration, and mood/affect were normal. On exam, there was slight limitation of range of motion (flexion). Straight leg raising was negative. Heel and toe walking were normal. The lower lumbar spine was tender with bilateral upper lumbar paraspinal tenderness. Plaintiff had decreased sensation in the left leg in an L4-5 pattern. Her gait was steady with no limp. Dr. Pradeep removed the stimulator and battery pack under local anesthesia the next day. (Tr. 319-330).

In October 2014, plaintiff told Dr. Black that "acetaminophen" worked well for her back pain and she requested refills of Vicodin and acetaminophen-oxycodone. He again advised her not to use the medications when "concentration on tasks needed." (Tr. 376).

In December 2014, plaintiff told Dr. Black that her medications were working well but also said that she had "constant aching pain" in her back and sharp pain with excessive activity. The pain radiated into her left leg and she had muscle spasms. Dr. Black noted a "non-focal" (normal) neurologic exam. (Tr. 372).

Dr. Andrew Koerber performed a consultative physical exam in February 2015. He noted that plaintiff was in pain throughout the exam and walked with an antalgic gate and slow pace. She had full strength in the extremities and decreased sensation in the left leg. She had moderate trouble doing a tandem walk, mild trouble doing a heel walk, and was unable to do a toe walk. She had pain when

squatting. Range of motion of the cervical and lumbar spine, both shoulders, and the right wrist was decreased. Dr. Koerber opined that plaintiff could sit, stand or move about for 30 minutes at a time and for no more than 4 hours total a day. (Tr. 438-444).

A consultative psychological examination was done by Paul Schneider, Ph.D., the same month. He observed that plaintiff had impaired concentration. He stated that "Right now the claimant's primary impairment is taking too much Xanax." He also stated, "My view is that she is impaired by the 6 milligrams of Xanax a day that she is taking." He concluded that her primary diagnosis was an impairment in cognition and memory due to sedative, hypnotic, or anxiolytic intoxication. He also noted that taking Adderall in addition to sedatives was "totally inappropriate." He spoke to her about Xanax dependency and the fact that it would be dangerous to go from taking 6 mg a day to none. He recommended that she be hospitalized for detox. He concluded that her concentration impairment was not caused by ADHD, but it was "attributable to the medications that she is taking." (Tr. 447-449).

In March 2015, plaintiff began seeing Dr. Michael Rawlings for back pain and anxiety. At the first visit, she was in no acute distress and had normal muscle strength and gait. For back pain, Dr. Rawlings prescribed Voltaren gel, Hydrocodone-acetaminophen, Oxycontin, and Cymbalta. He prescribed Amitriptyline (Elavil) for anxiety. She was to discontinue Adderall. (Tr. 659-661).

Dr. Rawlings saw plaintiff seven more times through April 2017. (Tr. 643-658). In September 2016, she said Oxycontin and Hydrocodone were effective for pain control, but she still had occasional pain in the right lower back radiating down the right leg. On exam, she was in no apparent distress and had a normal gait and normal strength. She had normal affect, judgment and behavior. (Tr. 647). In January 2017, she was compliant with Oxycontin and Hydrocodone, but reported that her back pain was worse. There are no notes regarding examination of her back. Dr. Rawlings recommended that she continue her present medications, and that she exercise, do physical therapy, and lose weight. She was 5'6" tall and weighed 198.9 pounds. (Tr. 645). At the last visit in April 2017, plaintiff reported increased pain in the right low back and chronic numbness in both lower extremities. She asked about having an MRI, but the doctor told her that an MRI would not change the management of her condition, and it was unlikely that additional surgery would be recommended if she still has pain after multiple back surgeries. On exam, she had minimal difficulty rising from a chair and a "mild limp secondary to pain." The assessment was chronic back pain. Her medications were refilled. (Tr. 643-644).

Plaintiff began seeing Dr. Massoud Stephane, a psychiatrist, in November 2016 for depression and anxiety which had worsened after the recent death of her friend. She requested Xanax, but Dr. Stephane did not recommend it for her. Instead, he prescribed Mirtazapine (Remeron) and a low dose of Adderall. In January 2017, Dr. Masoud noted "fair overall improvement in depression." Her

mood was improved, and her insight and judgment were good. Her attitude was cooperative, friendly, and pleasant. At the last visit in April 2017, said she was "stressed out." The findings on mental status exam were the same as on the previous visit. Dr. Stephane wrote that plaintiff showed good response and good tolerance to her medications. (Tr. 588-602).

  4.  **State Agency Consultants' Opinions**

A state agency consultant assessed plaintiff's physical RFC based on a review of the records in March 2015. He concluded that plaintiff was able to do light work, including sitting for 6 hours and standing/walking for 6 hours, with occasional postural activities. (Tr. 7172-). A second state agency consultant essentially agreed with this assessment in May 2015. (Tr. 86-88).

In March 2015 a state agency psychological consultant assessed plaintiff's mental RFC based on a review of the file contents. She used an electronic version of an agency form that is commonly used for this purpose in social security cases. (Tr. 73-74). The form consists of a series of questions and a list of mental activities. The consultant is asked to rate the applicant's limitations in these areas. The form explains that the "actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion." (Tr. 73).

The consultant answered "yes" to the question "Does the individual have sustained concentration and persistence limitations?" She rated plaintiff as "moderately limited" in ability to maintain attention and concentration for extended

mood was improved, and her insight and judgment were good. Her attitude was cooperative, friendly, and pleasant. At the last visit in April 2017, said she was "stressed out." The findings on mental status exam were the same as on the previous visit. Dr. Stephane wrote that plaintiff showed good response and good tolerance to her medications. (Tr. 588-602).

  4.  **State Agency Consultants' Opinions**

A state agency consultant assessed plaintiff's physical RFC based on a review of the records in March 2015. He concluded that plaintiff was able to do light work, including sitting for 6 hours and standing/walking for 6 hours, with occasional postural activities. (Tr. 7172-). A second state agency consultant essentially agreed with this assessment in May 2015. (Tr. 86-88).

In March 2015 a state agency psychological consultant assessed plaintiff's mental RFC based on a review of the file contents. She used an electronic version of an agency form that is commonly used for this purpose in social security cases. (Tr. 73-74). The form consists of a series of questions and a list of mental activities. The consultant is asked to rate the applicant's limitations in these areas. The form explains that the "actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion." (Tr. 73).

The consultant answered "yes" to the question "Does the individual have sustained concentration and persistence limitations?" She rated plaintiff as "moderately limited" in ability to maintain attention and concentration for extended

mood was improved, and her insight and judgment were good. Her attitude was cooperative, friendly, and pleasant. At the last visit in April 2017, said she was "stressed out." The findings on mental status exam were the same as on the previous visit. Dr. Stephane wrote that plaintiff showed good response and good tolerance to her medications. (Tr. 588-602).

  4.  **State Agency Consultants' Opinions**

A state agency consultant assessed plaintiff's physical RFC based on a review of the records in March 2015. He concluded that plaintiff was able to do light work, including sitting for 6 hours and standing/walking for 6 hours, with occasional postural activities. (Tr. 7172-). A second state agency consultant essentially agreed with this assessment in May 2015. (Tr. 86-88).

In March 2015 a state agency psychological consultant assessed plaintiff's mental RFC based on a review of the file contents. She used an electronic version of an agency form that is commonly used for this purpose in social security cases. (Tr. 73-74). The form consists of a series of questions and a list of mental activities. The consultant is asked to rate the applicant's limitations in these areas. The form explains that the "actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion." (Tr. 73).

The consultant answered "yes" to the question "Does the individual have sustained concentration and persistence limitations?" She rated plaintiff as "moderately limited" in ability to maintain attention and concentration for extended

periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent past without an unreasonable number and length of rest periods. In the section entitled "MRFC-Additional Explanation," the consultant discussed the consultative psychological exam, pointing out that Dr. Schneider noted that plaintiff's "concentration concerns are likely from her medications" and that she should be hospitalized for detox. She concluded that plaintiff "can understand, remember, and carry-out simple tasks" and she can "attend to task[s] for sufficient periods of time to complete simple tasks." Further, she could "manage unskilled tasks. Simple, with limited demand, pressure and complexity. Familiar tasks with limited work hassle and pace restrictions." (Tr. 74).

A second state agency consultant agreed with this assessment in May 2015. (Tr. 85-86).

## Analysis

Plaintiff's first two points relate to her mental limitations. She first argues that the ALJ erred in not including her moderate limitation in maintaining concentration, persistence, or pace in the RFC assessment and the hypothetical question posed to the VE.

Plaintiff correctly points out that, if the ALJ finds that a plaintiff has a moderate limitation in maintaining concentration, persistence or pace, that

limitation must be accounted for in the hypothetical question posed to the VE; in most cases, limiting the plaintiff to simple, repetitive tasks or to unskilled work is not sufficient to account for moderate concentration difficulties. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010). She argues that the ALJ erred by not including the areas in which the state agency consultants found that she had moderate limitations.

The ALJ is not automatically required to include a moderate limitation in concentration, persistence, or pace in every case in which a state agency consultant checks that box. Rather, "an ALJ may reasonably rely upon the opinion of a medical expert who translates these findings into an RFC determination." *Burmester v. Berryhill*, 920 F.3d 507, 511 (7th Cir. 2019). That is what the ALJ did here. Further, Plaintiff's argument ignores the critical finding by Dr. Schneider that her concentration problems were related to her use of Xanax. The state agency reviewers recognized that fact, as did the ALJ. The ALJ pointed out that Dr. Schneider noted that plaintiff "was taking too much Xanax with a resulting impairment in cognition and memory due to sedative, hypnotic, or anxiolytic intoxication." He also pointed out that plaintiff testified that she was no longer taking Xanax. (Tr. 21).

Plaintiff also argues that the ALJ overlooked evidence related to her mental impairments in that he failed to note that Dr. Black advised her to not use her prescription medications when concentration on tasks was needed. It is true that the ALJ did not mention Dr. Black's advice. However, the ALJ is not required to

discuss every piece of evidence in the record but must build a "logical bridge" from the evidence to his conclusion. *Vilano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). The ALJ did so here by relying on Dr. Schneider's report, the opinions of the state agency consultants, and the treatment notes indicating she was cooperative and friendly with good judgment, bright affect, and improved mood. (Tr. 21). Again, plaintiff ignores the fact that her concentration problems were attributed by Dr. Schneider to her use of Xanax, which she stopped taking in 2015.

Plaintiff also argues that the ALJ erred in his assessment of her back problems by failing to discuss the medications that she was prescribed and failing to discuss her diagnosis of failed back syndrome.

The ALJ did, in fact, acknowledge that plaintiff's back pain was treated with medications. (Tr. 20). It is true that he did not engage in an extended discussion of the medications, but it is difficult to see how that resulted in harmful error. Plaintiff does not argue that she suffered side-effects from the medications that would interfere with her ability to work. Rather, she seems to argue that the fact that her doctors prescribed narcotic medications proves that she had pain. However, the ALJ pointed out that the medical notes indicate that plaintiff reported that exams repeatedly showed that normal motor strength, gait, and range of motion. Also, plaintiff reported that her pain was stable and that her pain control was much better. (Tr. 20). In other words, her medications were working.

Plaintiff faults the ALJ for failing to identify failed back syndrome among her impairments. It is true that she was diagnosed with failed back syndrome or

post-laminectomy syndrome by a pain management doctor and by the doctor who implanted the stimulator, and Dr. Black referred to her "failed back" in January 2014. (Tr. 280, 292, 392, 568). However, the failure to designate an impairment as "severe" is not, standing alone, an error requiring remand. At step 2 of the sequential analysis, the ALJ must determine whether the claimant has one or more severe impairments. This is only a "threshold issue," and, if the ALJ finds at least one severe impairment, he must continue on with the analysis. And, at Step 4, he must consider the combined effect of all impairments, severe and non-severe. Therefore, a failure to designate a particular impairment as "severe" at Step 2 does not matter to the outcome of the case as long as the ALJ finds that the claimant has at least one severe impairment. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012), citing *Castile v. Astrue*, 617 F.3d 923, 927-928 (7th Cir. 2010).

Of course, regardless of the designation of impairments as severe, the ALJ is required to consider the combined effects of all impairments in determining plaintiff's RFC. "When assessing if a claimant is disabled, an ALJ must account for the combined effects of the claimant's impairments, including those that are not themselves severe enough to support a disability claim." *Spicher v. Berryhill*, 898 F.3d 754, 759 (7th Cir. 2018). Here, however, plaintiff does not argue that the evidence establishes that she had any specific limitation arising from failed back syndrome that was ignored by the ALJ. The ALJ identified degenerative disc disease of the lumbar spine as a severe impairment and considered the effects of that impairment. Plaintiff has not identified any additional limitations arising

from failed back syndrome.

Plaintiff argues that the ALJ erred in dismissing the findings of the examining consultant, Dr. Koerber. The Seventh Circuit has held that rejecting an agency examining doctor's opinion "that the claimant is disabled . . . can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir 2014). The ALJ did give a good explanation: at Tr. 20, he explained that he rejected Dr. Koerber's assessment because it conflicted with treatment notes reflecting normal motor strength, normal gait, and normal range of motion. One of the records he cited ("Ex. 25/58") is a note by Dr. Rawlings from a visit in March 2015, less than one month after Dr. Koerber's exam. (Tr. 660). The inconsistent results on the two examinations constitutes a good explanation for rejecting Dr. Koerber's opinion.

Lastly, plaintiff argues that the ALJ erred in evaluating her daily activities. However, the ALJ did not impermissively equate her daily activities with the ability to work full-time. Rather, he observed that, despite her allegations that she can stand for only 15 minutes and sit for 20 minutes, she was able to help care for a dog, go to the grocery store, drive a car, wash dishes, and prepare food. (Tr. 20). The ALJ did not discount her subjective allegations solely because of her daily activities; he also considered inconsistencies between her allegations and the medical evidence. His analysis was not "patently wrong" and so must be upheld. *Burmester,* 920 F.3d at 511.

This is not a case in which the ALJ failed to discuss evidence favorable to the

plaintiff or misconstrued the medical evidence. Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. She has not identified a sufficient reason to overturn the ALJ's conclusion.

Even if reasonable minds could differ as to whether plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## Conclusion

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:** May 23, 2019.

**DONALD G. WILKERSON**
**U.S. MAGISTRATE JUDGE**